JMM:BTR
F#2009R01607

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

    -against-

MELFORD CHRISTMAS,

        Defendant.

- - - - - - - - - - - - - - - - X

C O M P L A I N T

M. No. M 09 1196
(T. 18, U.S.C., § 201)

EASTERN DISTRICT OF NEW YORK, SS:

    JULIO SANTANA, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Homeland Security, Office of Inspector General ("DHS, OIG"), duly appointed by law and acting as such.

    In or about and between April 2007 and November 2009, both dates being approximate and inclusive, within the Eastern District of New York, the defendant MELFORD CHRISTMAS, being a public official, to wit: an Immigration Officer in the United States Citizenship and Immigration Services office, located in Garden City, New York, did knowingly, intentionally and corruptly demand, seek, receive, accept and agree to receive and accept, directly and indirectly, a thing of value, to wit: United States currency, in return for being influenced in the performance of one or more official acts.

    (Title 18, United States Code, Sections 201(b)(1)(A) and 3551 et seq.)

2

The source of your deponent's information and the grounds for my belief are as follows:[1]

1. I have been a Special Agent for more than twelve years: for the past five years with the DHS-OIG, and for seven years prior to that with United States Immigration and Customs Enforcement (formerly, the United States Immigration and Naturalization Service). My responsibilities currently include investigating criminal activity involving employees of the Department of Homeland Security, including employees of the United States Citizenship and Immigration Services ("USCIS").

2. The facts set forth in this affidavit are based on personal knowledge and observation, interviews of witnesses summarized below, my personal review of documentation and discussions with other federal law enforcement agents, specifically agents of the Federal Bureau of Investigation ("FBI").

3. The USCIS in Garden City, New York is one of several such offices in the New York metropolitan area responsible for adjudicating applications for United States citizenship. There, Immigration Officers review and adjudicate applications submitted by Legal Permanent Residents, commonly referred to as "permanent resident aliens" and "green card

---

[1] As this affidavit is submitted only to illustrate that probable cause exists to arrest, all the facts known to me as a result of my investigation have not been included.

3

holders," who seek to become naturalized United States citizens. The Immigration Officers' duties include interviewing applicants and administering and reviewing examinations concerning their proficiency in the English language and American civics and history. The Immigration Officer then determines whether the applicant has passed the examinations and met other qualifications necessary to become a naturalized United States citizen. Passage of proficiency tests, as judged by Immigration Officers, is a prerequisite to becoming a naturalized United States citizen. Interviews and proficiency tests are conducted on the USCIS premises in Garden City.

4. Since 2003, the defendant MELFORD CHRISTMAS has been an Immigration Officer for USCIS in the Garden City, New York office.

<u>Citizenship Applicant No. 1</u>

5. Information regarding the defendant and his involvement in illegal activities is derived, in part, from Citizenship Applicant No. 1 ("CA-1"), whose identity is known to the DHS-OIG and FBI. The information CA-1 has provided has been corroborated by other witnesses, by USCIS records, and by collateral investigation as set forth below. Your affiant believes CA-1 to be a reliable source of information.

6. In or about September 2006, CA-1 went to the USCIS office in New York, New York for the purpose of taking

proficiency tests in English and American history.  CA-1 failed both examinations.

7.  On or about July 24, 2007, CA-1 went to the USCIS office in Garden City, New York for the purpose of retaking the examinations.  CA-1 was interviewed the second time by an Immigration Officer who CA-1 described as a tall African-American male.  Once inside the Immigration Officer's office, the Immigration Officer asked CA-1 to write a few sentences for his English examination.  After doing so, the Immigration Officer read the sentences and then said, in sum and substance, that he would not tell CA-1 that he "did not pass."  However, the Immigration Officer then asked CA-1 for $800.  Based on the Immigration Officer's double-negative manner of evaluating the proficiency examination, CA-1 believed that the Immigration Officer would not approve the application unless CA-1 paid him money.  CA-1 agreed to pay.

8.  A few days later, the Immigration Officer called CA-1's cellular telephone, the number of which is known to Your affiant, and arranged to meet CA-1 at CA-1's residence in Brooklyn, New York.  According to CA-1, the Immigration Officer arrived driving a pick-up truck.  CA-1 then gave the Immigration Officer $800 in cash.

9.  I have reviewed CA-1's immigration alien file, which reveals that on July 24, 2007, the defendant MELFORD

CHRISTMAS adjudicated CA-1's naturalization citizenship application.

10. During this investigation, I have also obtained and reviewed telephone subscriber and toll records. Those records show that in August 2007 the defendant MELFORD CHRISTMAS placed multiple telephone calls from his personal cellular telephone to CA-1's cellular telephone. CA-1's citizenship application received approval from the defendant CHRISTMAS in August 2007.

11. In November 2009, a photo array of six African-American males, which included one photograph of the defendant, was shown to CA-1. CA-1 positively identified the defendant MELFORD CHRISTMAS as the Immigration Officer at the Garden City USCIS office, who solicited and subsequently received money from CA-1 as set forth above.

<u>Citizenship Applicant No. 2</u>

12. Information regarding the defendant and his involvement in illegal activities is derived, in part, from Citizenship Applicant No. 2 ("CA-2") and CA-2's spouse, whose identities are known to the DHS-OIG and FBI. The information CA-2 and CA-2's spouse have provided has been corroborated by other witnesses, by USCIS records, and by collateral investigation as set forth below. Your affiant believes the witnesses to be reliable sources of information.

6

13. In or about September 27, 2007, CA-2 went to the USCIS located in Garden City, New York for the purpose of taking American history and English examinations as part of a naturalization application. CA-2 had previously failed the history examination. CA-2 was accompanied by his/her spouse. CA-2's spouse indicated that CA-2 was interviewed on this occasion by a tall African-American male, whose name was CHRISTMAS.

14. Immigration Officer CHRISTMAS escorted CA-2 into his office on an upper floor of the USCIS, while CA-2's spouse remained in the first floor waiting area. CHRISTMAS reviewed CA-2's file, which contained personal information such as CA-2's address. After CHRISTMAS administered the American history examination to CA-2, CHRISTMAS asked CA-2 for $500. CA-2 told CHRISTMAS that he/she did not have that sum of money, but would ask CA-2's spouse for the money. CA-2 then went to the first floor waiting area where CA-2's spouse was waiting and asked for $500 to give to CHRISTMAS. CA-2's spouse did not have that amount of money, so CA-2 told CHRISTMAS that he/she would obtain the $500 upon returning home and later contact CHRISTMAS. After CA-2 promised to obtain the money, CHRISTMAS said that CA-2 had passed the examination. CHRISTMAS also took CA-2's telephone number, and told CA-2 that he would get the money from CA-2 later that evening. CA-2 received a Form N-652 (Naturalization

Interview Results) that stated that CA-2 had passed the American history and English examinations, and that his naturalization application had been approved. Later that evening, CA-2 received a telephone call from CHRISTMAS. CHRISTMAS told CA-2 that he was at a street corner near CA-2's home.

15. CA-2 and CA-2's spouse then went to meet CHRISTMAS. When they arrived, CA-2 saw CHRISTMAS sitting in a light-colored pick-up truck. CA-2's spouse walked over to the vehicle and handed CHRISTMAS $500 in cash in an envelope.

16. I have reviewed telephone subscriber and toll records, which show that the defendant MELFORD CHRISTMAS placed four telephone calls from his personal cellular telephone to CA-2's home telephone on the evening of September 27, 2007.

17. I have also reviewed a savings account bank book produced by CA-2's spouse, which showed a withdrawal of $500 on September 27, 2007. CA-2's spouse has advised Your affiant that the savings account was the source of the $500 used to pay CHRISTMAS.

18. I have also reviewed USCIS records pertaining to CA-2's citizenship application. Those records reveal that on September 27, 2007, the defendant MELFORD CHRISTMAS was CA-2's interviewing Immigration Officer.

## Citizenship Applicant No. 3

19. Information regarding the defendant and his involvement in illegal activities is derived, in part, from Citizenship Applicant No. 3 ("CA-3"), whose identity is known to the DHS-OIG and FBI. CA-3's information has been corroborated by other witnesses, by USCIS records, and by collateral investigation as set forth below. Your affiant believes CA-3 to be a reliable source of information.

20. On August 10, 2009, CA-3 appeared at the USCIS office in Garden City, New York for a naturalization interview and to take English language and civics examinations. CA-3 specifically identified the defendant MELFORD CHRISTMAS as the Immigration Officer who administered the tests. USCIS records corroborate that the defendant was the assigned Immigration Officer. At the beginning of the interview CHRISTMAS looked at CA-3's application and then said, in sum and substance, that CA-3 had a serious, unspecified tax problem. CA-3 then showed CHRISTMAS his/her tax documents for the previous four years. The defendant CHRISTMAS then left the room, and when he returned, he asked CA-3 to write his home address and telephone number on a notepad. CA-3 did so. CHRISTMAS then tore the page from the notepad and put it in his shirt pocket. CHRISTMAS then asked CA-3 how much money CA-3 had in the bank. CA-3 indicated he had $500 saved. CHRISTMAS then asked CA-3 if CA-3 had any more

money.  CA-3 responded that he/she did not have anymore money. The defendant CHRISTMAS then wrote the sum $1,500 on a piece of paper and told CA-3 that CA-3 needed to pay the defendant this amount of money.  CA-3 then told CHRISTMAS that it would take him one month to get that sum of money at which point CHRISTMAS administered the English language and civics examinations to CA-3.  CHRISTMAS then told CA-3 that CA-3 passed both examinations. CHRISTMAS then wrote $750 on a piece of paper and told CA-3 that he needed to pay the defendant that amount immediately and another $750 after he received his United States naturalization certificate.  CHRISTMAS then handed CA-3 a Form N-652 (Naturalization Interview Results) and checked two boxes indicating that although CA-3 passed the English and U.S. history and government tests a final decision regarding the citizenship application remained pending.

21.  On that same day, at approximately 6:00 p.m., CHRISTMAS called CA-3's cell phone three times to ask when CA-3 was going to arrive at his home.  At approximately 6:40 p.m., CA-3 arrived at his home to find the defendant CHRISTMAS waiting for him parked in a parked gray sports utility type vehicle. CHRISTMAS once again asked for $750.  At this point, CA-3 told the defendant that he/she would not pay CHRISTMAS any money. CHRISTMAS responded by telling CA-3 that CA-3 would have unspecified problems with his/her citizenship application if CA-3

did not pay CHRISTMAS the amount of money demanded. CA-3 subsequently notified federal agents about this event.

22. On or about August 20, 2009, acting at the direction of federal agents, CA-3 made several consensually-recorded telephone calls to CHRISTMAS's personal cellular telephone. In the first call, at approximately 3:40 p.m., CA-3 telephoned CHRISTMAS, who said he would call CA-3 back. At 6:43 p.m., CA-3 once again called CHRISTMAS, who agreed to meet CA-3 within an hour and asked CA-3 to repeat his home address. At 8:34 p.m., CHRISTMAS called CA-3 and canceled the meeting saying that he was too busy but would meet with CA-3 at a later time. A second meeting was set for August 24, 2009, but again on that date CHRISTMAS canceled the meeting.

23. In or about November 2009, CA-3 was shown a photographic array of six African-American males, one of which was the defendant MELFORD CHRISTMAS. CA-3 positively identified the photograph of CHRISTMAS as the Immigration Officer who solicited $1,500 from CA-3 as set forth above.

Citizenship Applicant No. 4

24. Information regarding the defendant and his involvement in illegal activities is derived, in part, from Citizenship Applicant No. 4 ("CA-4"), whose identity is known to the DHS-OIG and FBI. The information CA-4 has provided has been corroborated by other witnesses, by USCIS records, and by

11

collateral investigation as set forth below. Your affiant believes CA-4 to be a reliable source of information.

25. On September 1, 2009, CA-4 appeared at the USCIS office located in Garden City, New York for a naturalization interview and to take English language and civics examinations. CA-4 has advised that he/she was interviewed by the defendant MELFORD CHRISTMAS. At the beginning of the interview, CHRISTMAS looked at CA-4's application and told CA-4 that without additional tax returns and a marriage certificate, CA-4's application faced unspecified problems. CHRISTMAS then put his hand to his head and stated, in sum and substance, "Give me some time to think." After a few moments, CHRISTMAS told CA-4 that an un-identified "friend" of the defendant's might be able to "help" CA-4 with respect to his/her citizenship application. CHRISTMAS then asked how much CA-4 had in the bank. When CA-4 responded that he/she had approximately $3,000, CHRISTMAS stated, in sum and substance, that although $3,000 was not much money, he would still try to "help" CA-4. CHRISTMAS then wrote the numbers 1450 and 1300 on a piece of paper and handed it to CA-4. CHRISTMAS indicated that the first amount was for him and the second for his friend. CHRISTMAS then took the note back. CA-4 responded that he/she could not give CHRISTMAS such an amount of money. CHRISTMAS said he would schedule CA-4's taking of the oath of citizenship in September 2009, but only if CA-4 agreed to pay the

defendant the money demanded. If not, CHRISTMAS said, he would put CA-4's application back into the computer and re-schedule CA-4 for another appointment in USCIS in October. CA-4 told CHRISTMAS that he was demanding too much money at which point CHRISTMAS asked how much CA-4 could give him, adding that upon approval of CA-4's application, CA-4's spouse and children would also become citizens, "and I will have zero." CA-4 offered to give the defendant $500. CHRISTMAS rejected the offer and threatened to not approve CA-4's application and place it back into the computer. CA-4 then offered to give the defendant $1,000 at which point CHRISTMAS announced that CA-4 had passed the citizenship examinations. CHRISTMAS then arranged to meet CA-4 at a later date to collect from CA-4 the additional tax returns, marriage certificate and $1,000.

26. A photographic array that included the defendant MELFORD CHRISTMAS was reviewed by CA-4 in November 2009. CA-4 identified the defendant as the Immigration Officer who solicited money as set forth above.

27. New York State Department of Motor Vehicles records reveal that, consistent with the statements of CA-2 and CA-3, in 2007, the defendant MELFORD CHRISTMAS had registered to himself a grey colored pick-up truck.

WHEREFORE, Your deponent respectfully requests that a warrant issue and that the defendant be dealt with according to

13

law.  Finally, I request that this affidavit be maintained under seal until further order of the Court.

_____
JULIO SANTANA,
Special Agent,
U.S. Department of Homeland Security,
Office of Inspector General


Sworn to before me this
4th day of December, 2009

_____
HON. A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK